**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 7** |
| **CLIFTON JAMES ERVIN,** | ) | |
| | ) | **Case No. 15-70467** |
| Debtor. | ) | |

| | | |
|---|---|---|
| **JUDY A. ROBBINS, UNITED STATES** | ) | |
| **TRUSTEE FOR REGION FOUR,** | ) | |
| | ) | |
| Movant, | ) | **MOTION TO DISMISS** |
| | ) | **CASE FOR ABUSE** |
| v. | ) | |
| | ) | |
| **CLIFTON JAMES ERVIN,** | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the Motion to Dismiss Case for Abuse filed by

Judy A. Robbins, United States Trustee for Region Four (the "U.S. Trustee"), by counsel, against

the Debtor, Clifton James Ervin (the "Debtor").  The Debtor filed a response, pre-trial discovery

was conducted, and a trial was held on the Motion on December 10, 2015 with the U.S. Trustee

asserting that a presumption of abuse exists under Section 707(b)(2) of the Bankruptcy Code.

The U.S. Trustee alternatively contends that, even if no presumption of abuse exists, granting the

Debtor a discharge would be an abuse of Chapter 7 of the Bankruptcy Code pursuant to Section

707(b)(3).  Thereafter, the U.S. Trustee and the Debtor each filed a closing argument brief and

rebuttal brief.  Upon consideration of the evidence adduced at trial, a review of the parties'

submissions, and for the reasons set forth below, the Court grants the U.S. Trustee's Motion to

Dismiss Case for Abuse and will dismiss the Debtor's case unless the Debtor moves to convert

his case to a case under Chapter 13 of the Bankruptcy Code within twenty-one (21) days of entry of the order filed contemporaneously herewith.

## **FINDINGS OF FACT**[1]

The Debtor filed an individual petition under Chapter 7 of the Bankruptcy Code on April 7, 2015.  The petition provides that his debts are primarily consumer debts.  The Debtor's Schedules I and J were filed with the petition, and the Debtor filed an amended Schedule J on May 22, 2015 ("Amended Schedule J").  *See* Docket Nos. 1, 11.  The Debtor has been employed by the Town of Rocky Mount, Virginia as Town Manager for eight (8) years.  U.S. Trustee Ex. 1, at 21.  The testimony at trial reflects that the Debtor maintains a residence in Blacksburg Virginia, where due to child custody arrangements, his non-filing spouse, Lenore Ervin ("Mrs. Ervin"), is required to reside with her 10-year-old son, the child of a previous marriage.  The Debtor, however, is required to maintain a residence in Rocky Mount as a condition of his employment there.  Thus, the Debtor and his wife spend a considerable amount of time each week commuting, either between residences or between residences and work.  Both the Debtor and his wife are well educated, each with degrees from well-known universities.  Mrs. Ervin is a principal in Spectrum Design, P.C. ("Spectrum") in Roanoke, Virginia, where she works as a licensed interior designer.  She has been so employed for twelve (12) years.  *Id.*

### The Debtor's Means Test Form:  Income

The issues in the case were framed initially by the Motion and Debtor's response, each based on the Debtor's schedules and the means test calculation.  The Debtor lists two minor dependents, Mrs. Ervin's son and the Debtor's now 17-year-old daughter, also from a previous

---

[1] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.  *See* Fed. R. Bankr. P. 7052, 9014(c).

marriage.  A household size of four is listed on Amended Schedule J, and on Official Form 22A-2 (the "Means Test Form"), respectively.  U.S. Trustee Ex. 1, at 43-52; U.S. Trustee Ex. 2, at 1.

The Debtor reported current monthly income of $7,384.89 for the Debtor and current monthly income of $4,645.33 for the non-filing spouse for a total current monthly income of $12,030.22 on Official Form 22A-1 (the "Statement of Current Monthly Income").  U.S. Trustee Ex. 1, at 42.  According to the Statement of Current Monthly Income, the median family income for a family of four in Virginia is $91,859.00.[2]  *Id.*  The Debtor's annual income according to Part 2 of the Statement of Current Monthly Income is $144,362.64.  *Id.*  Thus, the Debtor reported an above-median income, and the Means Test Form is used to determine if a presumption of abuse arises.  *Id.*

According to the Means Test Form, the Debtor subtracted from his non-filing spouse's income the following amounts not used to pay for the Debtor's household expenses: (a) $1,216.19 for "Tax, medicare, social security"; (b) $163.61 for "Mandatory & voluntary contributions – retirement"; and (c) $1,994.07 for "Debts solely of wife (see attached)."  *Id.* at 43.  The debt attachment listed several amounts, including a $615.00 monthly payment to Spectrum, the non-filing spouse's employer.  *Id.* at 44.  Subtracting the above payments (a) through (c) resulted in the Debtor's current household monthly income being listed as $8,656.35 ($12,030.22 - $3,373.87).  *Id.* at 43.  The Debtor also deducted $240.00 for health care allowance, $488.00 for vehicle operation expense, $210.33 for vehicle ownership or lease expense, $2,057.55 for taxes, $369.24 for involuntary deductions, including retirement contributions, $350.00 in court-ordered support payments, and $235.00 in additional health care expenses, excluding insurance costs.  *Id.* at 45-48.  The Debtor also deducted $600.00 total for

---

[2] However, the applicable median family income for a family of four in Virginia, as of the petition date, is $93,349.00.  *See Means Testing*, U.S. Dep't of Justice, http://www.justice.gov/ust/means-testing/means-testing-cases-filed-between-april-1-2015-and-may-14-2015-inclusive.

health insurance and a health savings account, $1,345.00 for mortgage payments, and $306.67

for vehicle loans. *Id.* at 49-50. The total deductions from income total $8,677.79. *Id.* at 51. The

Debtor subtracted the total deductions of $8,677.79 from the adjusted current monthly income of

$8,656.35, leaving a monthly disposable income of negative $21.44. *Id.* Thus, the Debtor

asserts that no presumption of abuse arises. *Id.* Part 4 of the Means Test Form allows a debtor to

provide details about "any special circumstances that justify additional expenses or adjustments

of current monthly income for which there is no reasonable alternative." The Debtor marked the

box "no" on his Means Test Form when asked if he had any such "special circumstances." *Id.* at

52.

The U.S. Trustee's Recalculation of the Debtor's Household Income

In the Motion, the U.S. Trustee argues that, "[a]ccording to the payment advices for the

Debtor and his non-filing spouse for the applicable period for calculating the Debtor's combined

current monthly income (October-March), the Debtor should have reported (i) a current monthly

income equal to $7,491.56, and (ii) a current monthly income equal to $4,824.00 for Mrs. Ervin.

The latter figure does not include any amounts Mrs. Ervin may receive on account of her

ownership interests in Ten East Church LLC ("TECA," a work-related real estate LLC) and

Spectrum. Thus, the U. S. Trustee contends the Debtor and his wife have a combined monthly

income equal to $12,315.56 ($7,491.56 + $4,824.00). Mot. to Dismiss ¶ 11. In addition, the

U.S. Trustee argues that "[e]ven if every deduction claimed by the Debtor [on the Means Test

Form] is allowed, the Debtor should have reported $246.75 in monthly disposable income and

that the presumption of abuse arises in this case." *Id.* at ¶ 12. The U.S. Trustee further argues

that the Debtor is not entitled to certain deductions claimed and that the Debtor did not file this

case because of any financial calamity or loss of employment. Further, the U.S. Trustee

contends that no special circumstances justify additional expenses or adjustments in income, and that the totality of the circumstances of the Debtor's financial situation demonstrates that it would be an abuse of the provisions of Chapter 7 of the Bankruptcy Code for the Debtor to receive a discharge in this case.  *Id.* at ¶¶ 13, 19.

In his Response, the Debtor denies that a presumption of abuse arises and denies that he should not be granted a discharge, arguing that he filed this bankruptcy case "due to the steadily declining financial position of he and his family . . . including his wife's health, her job situation, the medical needs of the family, and having exhausted their savings hoping that their situation would get better" and that "[v]iewed under the totality of the circumstances, the Debtor's case should not be dismissed."  Resp. ¶¶ 12, 19, 26.  The Debtor's response made no mention of "special circumstances" or 11 U.S.C. § 707(b)(2)(B), nor did it itemize additional expenses or adjustments to income, attach documentation to that effect, or even indirectly provide a detailed explanation of any special circumstances believed to exist.

<u>Debtor's Testimony</u>

At trial, the Debtor, Mrs. Ervin and Everett Mann, Bankruptcy Analyst for the U.S. Trustee ("Mr. Mann"),[3] each testified.  The Debtor testified that the information contained in the schedules and amended schedules were true and accurate at the time the documents were filed with the Court.  However, the Debtor testified that he did not report $65.00 per month in reimbursements he receives from his employer, nor did he report the holiday bonus he received in 2014.[4]

---

[3] The Court determined that Mr. Mann was qualified as an expert witness for certain accounting matters applicable to this case.
[4] The Debtor testified that the holiday bonus is discretionary and must be approved by the Town Council.

Additionally, the Debtor testified that he contributes $1,800.00 per year, or approximately $150.00 per month, to "flex medical."  When questioned by the U.S. Trustee, the Debtor indicated that he had overstated the amount on Schedule I for "flex medical" to include an additional deduction for which the Debtor could not recall.[5]  The Debtor testified that as the Rocky Mount Town Manager, he is responsible for preparing the town's budget, and on Schedule I, the Debtor selected "No" under "Do you expect an increase or decrease within the year after you file this form?"  However, the Debtor testified that on April 1, 2015, the Debtor presented a town budget to the Town Council which included a 3.5 percent pay raise.  When questioned why the Debtor did not disclose this increase, the Debtor testified that receiving the pay raise was a "random chance" and thus, after discussing it with his counsel, the Debtor did not disclose it on his schedules.  The Debtor also testified that, as of July 2015, the Debtor actually received a 2.5 percent pay increase.

In addition, the Debtor testified that the $225.16 monthly payroll deduction for repayment of retirement fund loans will cease to be deducted after January 2016 because the loan will be paid in full at that time.  The Debtor also testified that his wife aspired to make the $615.00 monthly payment to Spectrum each month, but they were finding it difficult, and so far they had set aside only $1,900.00 toward an annual lump sum payment, which was not yet made.[6]  The Debtor also testified that he received federal tax refunds ranging from approximately $1,600 to $2,400 for 2012 through 2014.  On the expense side, the Debtor testified that his car insurance payments have increased $125.00 per month because the Debtor added his 17-year-old daughter to his policy.  The Debtor also testified that the $200.00 per

---

[5] In Schedule I, the Debtor listed a monthly payroll deduction of $450.00 for "flex medical."  U.S. Trustee Ex. 1, at 22.

[6] The Debtor testified that he and the non-filing spouse are making an annual payment to Spectrum, but not at the $615.00-per-month annualized amount, i.e., not $7,380.00 per year.

month listed under Line 21 as "Mr. and Mrs. Weis Loan" is a loan that the Debtor's wife is

repaying to her parents.

Regarding his income, the Debtor testified that although his salary was $88,352.00 in

2014, he recorded a gross income of only $82,000.00 on his Statement of Financial Affairs

("SOFA").  *See* U.S. Trustee Ex. 1, at 26.  The Debtor further testified that although his salary

was $85,000.00 in 2014, he reported a gross income of only $76,000.00 on his SOFA.  *See id.*

The Debtor also testified that although he does not have any children as a result of his current

marriage, he is the primary support for his 17-year-old daughter.  After examining his wife's

payroll activity included as U.S. Trustee's Exhibit No. 4, the Debtor testified that his wife's

gross pay is approximately $2,100.00 per bi-weekly pay period.  In addition, the Debtor testified

that the pay advice listed on Page 9 of the U.S. Trustee's Exhibit No. 5, dated July 24, 2015,

reflects the Debtor's pay including the 2.5 percent raise.

When the U.S. Trustee questioned the Debtor about calculations for the applicable means

test calculation period—October 1, 2014 to March 31, 2015—on the Statement of Current

Monthly Income and Means Test Form, the Debtor again testified that the $615.00 monthly

payment to Spectrum was included in the calculations, but not set aside each month.  The Debtor

also testified that the $150.00 claimed under Line 25 of the Means Test Form is for a Flexible

Spending Account, not a high-deductible or Health Savings Account.  The Debtor also claimed

$240.00 for health expenses and $235.00 per month for additional health care expenses,

excluding insurance costs.  However, the Debtor testified that he believes that out-of-pocket

expenses total approximately $6,085.00 annually based on the latest explanation of benefits

provided by the Debtor's health insurance company.[7]

---

[7] The U.S. Trustee calculated $745.00 per month in total health care expenses claimed.  This is consistent with the
Means Test Form ($120.00 for the "Medical bill – Lewis Gale" on Attachment 3(C); $240.00 for the "Out-of-pocket

When questioned by Counsel for the Debtor, the Debtor testified that the monthly gross income for both him and the non-filing spouse is $12,343.33, not including any holiday bonus the Debtor might receive. The Debtor testified that Amended Schedule J is reflective of the actual obligations that the Debtor is either incurring or paying each month. Line 22 of Amended Schedule J lists monthly expenses of $6,727.00[8]; Line 23a lists combined monthly income of $7,098.59; and Line 23c lists monthly net income of $371.59.

Additionally, the Debtor testified that several issues resulted in him consulting with counsel regarding his financial situation, including (a) a heat pump that needed repair, (b) Mrs. Ervin's son being diagnosed with diabetes, (c) Mrs. Ervin sustaining an injury from a fall, (d) the Debtor's daughter moving in with him, (e) a pay cut, and (f) an increase in travel expenses. The Debtor also testified that he took several actions to decrease his expenses including (i) quitting smoking, (ii) renting a less expensive residential property in the location where he is employed, (iii) canceling a gym membership, (iv) reducing pet expenditures, (v) cutting back on the frequency of eating at restaurants, and (vi) switching to a prepaid cell phone plan.

The Debtor also testified that he and Mrs. Ervin purchased a house in Blacksburg as opposed to Rocky Mount or Roanoke because of Mrs. Ervin's child custody arrangement and that choosing school districts played a part in the decision. The Debtor testified that he commutes 85 miles each way from Blacksburg to Rocky Mount for his employment, and stays at the property he rents in Rocky Mount a few times per week. The Debtor also testified that he has "applied for every position [he] can to have a more successful living arrangement," but he does

---

health care allowance per person" times four people under the age of 65 for Lines 7a through 7g; $235.00 for "Additional healthcare expenses, excluding insurance costs" under Line 22; and $150.00 under "Health savings account," which the Debtor testified is actually a flexible spending account).

[8] The monthly expenses include the $615.00 per month to Spectrum that the Debtor testified is not being paid at the full amount.

not anticipate being offered a position because he is "not as mobile," presumably because of his wife's custody mandate.

When further questioned by Counsel for the U.S. Trustee, the Debtor testified that, in the U.S. Trustee's Exhibit 6, the $2,170.80 bi-weekly gross pay for Mrs. Ervin is just wage income and that, when multiplied by 26 pay periods per year and divided by 12 months per year, the calculation is actually $4,703.40 per month, not $4,300.00. Using the U.S. Trustee's calculation for net pay, the Debtor testified that Mrs. Ervin's net pay of $1,490.55 results in $3,229.53 per month ($1,490.55 x 26 pay periods divided by 12 months). After reviewing the U.S. Trustee's Exhibit 11, as amended, the Debtor acknowledged that, on average for the five-month period from February 23, 2015 to July 20, 2015, he spent $801.53 per month on groceries, $229.88 per month on internet shopping, $369.91 at restaurants, and $117.08 on miscellaneous shopping.

<u>Mrs. Ervin's Testimony</u>

Mrs. Ervin testified that she is part owner of Spectrum and of TECA, which owns the building where Spectrum is located.[9] Mrs. Ervin further testified that Spectrum receives an end-of-year distribution in profit in years where a tax liability results, the most recent being in 2013. Mrs. Ervin also testified that Spectrum currently has an outstanding line of credit, that Spectrum needs monthly cash flow of at least $275,000.00 to break even, and that distributions to cover taxes on profits are discretionary. Although she projects $325,000.00 in profit for Spectrum, Mrs. Ervin testified that the company is still in debt to the bank, that Spectrum needs to hire more employees, and that through 2018 Spectrum is paying a substantial buy-out sum each year to a former owner. Thus, any potential distributions to her are speculative at best.

---

[9] The Debtor testified that TECA receives rent from Spectrum.

Mrs. Ervin further testified that she used credit cards in the six-month period prior to the

Debtor's bankruptcy filing to make purchases such as gifts and replacing her wardrobe, including

shoes, due to gaining weight following her injury.[10]   In addition, Mrs. Ervin testified that she

owes her parents $10,000.00 plus six percent interest for a loan provided to her, which will be

paid out in December 2016 or January 2017.  Mrs. Ervin also testified that she owes

approximately $14,000.00 to Spectrum, in addition to student loan debt and a car payment.

Mrs. Ervin also testified that she shares expenses for her son with her ex-husband, but

that she often pays for counseling herself because her husband opposes the extent and cost of his

counseling.  Mrs. Ervin also testified that her salary now is 20 percent less than when she began

work at Spectrum in 2006.[11]   Further, Mrs. Ervin testified that she commutes 48.5 miles each

way to her office each day, and that her car is 10 years old with 140,000 miles on it.  She

anticipates needing a replacement car in the next six months.  Mrs. Ervin also testified that she

suffers from hypersomnia which requires $290.00 per month in prescription costs for medication.

In addition, Mrs. Ervin testified that she pays $8.80 for lunch approximately three to four times

per week and has one or two "TV dinners" per week.  Mrs. Ervin further testified that she

contributed $25,000.00 from her IRA to make a 10 percent down payment to purchase a house

with the Debtor in Blacksburg following their marriage.

When reviewing U.S. Trustee's Exhibit 6, Mrs. Ervin testified that there should be

contributions to her IRA and deductions for health insurance[12] reflected on the pay advice.  Mrs.

Ervin testified that she believes she contributes three or four percent and that her employer

---

[10] Mrs. Ervin testified that, two years prior to the trial date, she ruptured her spleen and Achilles tendon in a fall, which required physical therapy and certain medications.
[11] Mrs. Ervin also testified that she used to receive bonuses from Spectrum.
[12] Mrs. Ervin later testified that her employer pays her health insurance, but that she is "not sure how they do it from a W-2 standpoint."

matches her IRA contribution.  Mrs. Ervin also testified that TECA has other tenants, but the rental income is restricted to paying debt service, so she receives no income distribution.

### Mr. Mann's Testimony

Mr. Mann testified that he reviewed the Debtor's tax returns for calendar years 2013 and 2014.  Mr. Mann further testified that he requested Schedules K-1 from the Debtor, but did not receive them for 2013 or 2014.  After reviewing the Debtor and Mrs. Ervin's 2013 Individual Income Tax Return, Mr. Mann testified that the Debtor and Mrs. Ervin received tax refunds of $2,767.00 in 2011, $3,094.00 in 2012, and $7,304.00 in 2013.  *See* U.S. Trustee Ex. 7, at 47.  Mr. Mann further testified that the Debtor and Mrs. Ervin received a tax refund of $1,672.00 for 2014.  *See* U.S. Trustee Ex. 8, at 5.

In addition, Mr. Mann testified that the spreadsheet provided as U.S. Trustee's Exhibit No. 9 is a projection for 2015 tax liability based on representations made by the Debtor.  In addition, Mr. Mann testified that the amounts listed in the spreadsheet provided as U.S. Trustee's Exhibit No. 10 are based on IRS guidelines for expenditures based on a family of four—this spreadsheet lists disposable income of $379.06.  Mr. Mann testified that he also reviewed bank statements supplied by the Debtor and Mrs. Ervin, which did not support certain expenditure amounts listed on the Debtor's schedules filed with the Court.  After reviewing the required taxes in 2014 and comparing them to the projected taxes in 2015, Mr. Mann testified that the Debtor and Mrs. Ervin, assuming the 25 percent marginal rate applies, will be subject to an increase in taxes of no more than $4,707.00.[13]

---

[13] After reviewing a chart supplied by the Trustee that was not admitted into evidence, Mr. Mann testified that he estimated an increase in taxable income of $26,168.00 based on the highest marginal rate of 25 percent.  Based on the data calculated by Mr. Mann, the Debtor is projected to owe an increase in taxes of $4,707.00 when accounting for certain deductions for health insurance, alimony, and the standard exemption.  When offset by the $1,672.00 tax refund received for 2014, the Debtor is projected to owe an additional $3,035.00 in taxes for 2015.

<u>Post-Trial Briefs</u>

Following the trial, the parties submitted their respective closing argument briefs and rebuttal briefs.  The U.S. Trustee requests that the Court grant the Motion because the presumption of abuse arises under Section 707(b)(2), the presumption was not rebutted and could not have been rebutted, and even if the Debtor had met the statutory requirements to attempt to rebut the presumption, no special circumstances exist in this case.  In addition, the U.S. Trustee requested dismissal because, pursuant to Section 707(b)(3), the totality of the circumstances in this case demonstrate an abuse of the Chapter 7 provisions.  The Debtor requests the Court deny the Motion because special circumstances exist which would rebut the presumption of abuse and that granting the Debtor relief would not be an abuse of the Chapter 7 provisions.

## **<u>CONCLUSIONS OF LAW</u>**

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.  This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

The U.S. Trustee's argument that the case should be dismissed is two-fold: (1) the case is presumptively abusive and the presumption cannot be rebutted; and (2) even if the presumption of abuse did not arise in the case, the granting of a Chapter 7 discharge to the Debtor is abusive when viewed in the totality of the circumstances.  The Debtor argues that he has demonstrated "special circumstances" which would rebut any presumption of abuse, and that granting relief under Chapter 7 would not be an abuse of the bankruptcy provisions.

12

I.    **Presumption of Abuse Under Section 707(b)(2)**

Pursuant to Section 707(b)(1), "[a]fter notice and a hearing, the court, on its own motion

or on a motion by the United States trustee . . . may dismiss a case filed by an individual debtor

under [Chapter 7] whose debts are primarily consumer debts, or, with the debtor's consent,

convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of

relief would be an abuse of the provisions of [Chapter 7]."  11 U.S.C. § 707(b)(1).  The

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") provides a

framework for determining whether a debtor's filing of a Chapter 7 petition is presumptively

abusive.  *See Williams v. McDow (In re Williams)*, No. 5:10CV00049, 2010 WL 3292812, at *1,

2010 U.S. Dist. LEXIS 85221, at *2, (W.D. Va. Aug. 19, 2010).  The purpose of BAPCPA is to

"improve bankruptcy law and practice by restoring personal responsibility and integrity in the

bankruptcy system and ensure that the system is fair for both debtors and creditors."  H.R. Rep.

No. 109-31, pt. 1, at 2 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88.  BAPCPA revised Section

707(b) to lower the standard for dismissal of a Chapter 7 petition from "substantial abuse" to

"mere abuse" and removed the presumption that debtors were entitled to relief.  *In re Reed*, 422

B.R. 214, 221 (C.D. Cal. 2009) (citing *In re Bender*, 373 B.R. 25, 28 (Bankr. E.D. Mich. 2007)).

In BAPCPA, Congress implemented the "means test," which is a calculation for triggering a

presumption of abuse.  *Williams*, 2010 WL 3292812, at *1, 2010 U.S. Dist. LEXIS 85221, at *2.

"The purpose of the means test is to distinguish between debtors who can repay a portion of their

debt and debtors who cannot."  *In re Ross-Tousey*, 549 F.3d 1148, 1151 (7th Cir. 2008),

*abrogated on other grounds by Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011).  The

means test is "intended to ensure that debtors repay creditors the maximum they can afford."

H.R. Rep. No. 109-31, pt. 1, at 2 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88.

First, the Court must compare the Debtor's annualized combined monthly income to the applicable state median income.  If the Debtor's annual income is lower than the state median income, abuse is not presumed, but if the Debtor's annual income is higher, the debtor must calculate his monthly disposable income via the means test set forth in Section 707(b)(2). *Williams*, 2010 WL 3292812, at *1, 2010 U.S. Dist. LEXIS 85221, at *2 (citing 11 U.S.C. § 707(b)(7)).

In considering whether granting a debtor relief would be an abuse of the provisions of Chapter 7, the Court "shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) [of Section 707(b)(2)(A)], and multiplied by 60 is not less than the lesser of—(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,475, whichever is greater; or (II) $12,475."  11 U.S.C. § 707(b)(2)(A) (footnote omitted).  This calculation "subtracts certain necessary expenses from the debtor's monthly income, such as the cost of housing, utilities, taxes, and health insurance." *Williams*, 2010 WL 3292812, at *1, 2010 U.S. Dist. LEXIS 85221, at *2.  The debtor's monthly disposable income is then computed and compared to statutory benchmarks in order to determine whether the debtor's bankruptcy petition is presumptively abusive.

Once the presumption of abuse has been established, the debtor may rebut the presumption only by "demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces" to justify additional expenses or adjustments to the debtor's current monthly income "for which there is no reasonable alternative."  11 U.S.C. § 707(b)(2)(B).  Each example is "unusual and exceptional as the word 'special' connotes."  *In re Alther*, 537 B.R. 262, 266 (Bankr. W.D. Va. 2015).  "[T]he similarity in nature of the two examples is that they are life circumstances that directly and unavoidably

affect one's earning capacity or give rise to necessary, additional expenses." *In re Smith*, 388

B.R. 885, 888 (Bankr. C.D. Ill. 2008). To establish special circumstances, a debtor must

"itemize each additional expense or adjustment of income" and "provide—(I) documentation for

such expense or adjustment to income; and (II) a detailed explanation of the special

circumstances that make such expenses or adjustment to income necessary and reasonable." 11

U.S.C. § 707(b)(2)(B)(ii). The debtor must also "attest under oath to the accuracy of any

information provided to demonstrate that additional expenses or adjustments to income are

required." 11 U.S.C. § 707(b)(2)(B)(iii).

If the presumption of abuse does not arise or has been rebutted under § 707(b)(2)(B), a

chapter 7 petition may still be dismissed if the totality of the circumstances demonstrate that the

debtor's petition is abusive. 11 U.S.C. § 707(b)(3)(B).

## II.      Burden of Proof

Generally, the party who is asserting that a debtor's case is abusive holds the burden of

proof. *Williams*, 2010 WL 3292812, at *3, 2010 U.S. Dist. LEXIS 85221, at *9 (citing *In re*

*Witek*, 383 B.R. 323, 326 (Bankr. N.D.Ohio 2007) ("In either [an action under § 707(b)(2) or an

action under § 707(b)(3)], the party bringing the action for dismissal carries the burden of

proof.")). BAPCPA expressly provides that, after a presumption of abuse has been established

under Section 707(b)(2), the burden of persuasion shifts to the debtor to demonstrate "special

circumstances" to rebut the presumption. *Id.* (citing 11 U.S.C. § 707(b)(2)(B)); *see also In re*

*Meade*, 420 B.R. 291, 303 (Bankr. W.D. Va. 2009) ("The burden of proof is clearly upon the

debtor to rebut a presumption of abuse which has arisen under § 707(b)(2)."). Thus, the U.S.

Trustee bears the burden of proof in establishing a prima facie case in support of the application

of the presumption of abuse under § 707(b)(2). *See Williams*, 2010 WL 3292812, at *3, 2010

U.S. Dist. LEXIS 85221, at *9-10.  Because the presumption is applied only after a debtor fails

the means test, the initial burden of establishing a prima facie case that the Debtor's disposable

monthly income exceeds the relevant statutory benchmarks is on the U.S. Trustee.  *See Williams*,

2010 WL 3292812, at *3, 2010 U.S. Dist. LEXIS 85221, at *10.

### III.      Application of the Means Test

As an initial matter, Section 707(b)(7) must be satisfied in order to determine whether the

motion under Section 707(b)(2) may even be filed by the U.S. Trustee.[14]  *See* 11 U.S.C. §

707(b)(7)(A).  Section 707(b)(7)(A) provides "No . . . United States trustee . . . may file a motion

under [Section 707(b)(2)] if the current monthly income of the debtor . . . and the debtor's spouse

combined, as of the date of the order for relief when multiplied by 12, is equal to or less than—

. . . (ii) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family

income of the applicable State for a family of the same number or fewer individuals."  11 U.S.C.

§ 707(b)(7)(A)(ii).  In this case, the applicable state median family income,[15] Virginia's median

family income, is $92,623.00.[16]  The Debtor's combined monthly income as of the date of the

order for relief, according to the schedules and testimony provided at trial, is at least

$144,362.64.  Thus, because the Debtor's annual income is higher than Virginia's median

income, the Debtor must calculate his monthly disposable income pursuant to the means test set

forth in Section 707(b)(2).

---

[14] If Section 707(b)(7) is not satisfied, pursuant to Section 707(b)(6), the U.S. Trustee may still file the motion under §§ 707(b)(1) or (3).  *See* 11 U.S.C. § 707(b)(6).
[15] The original source for the State Median Family Income is the Census Bureau.  *See Means Testing*, U.S. Dep't of Justice, http://www.justice.gov/ust/means-testing (last visited Feb. 3, 2016).
[16] *See State Median Income by Family Size (1-year)* spreadsheet (2014), U.S. Census Bureau, http://www.census.gov/hhes/www/income/data/statemedian/ (last visited Feb. 3, 2016).

In this case, 25 percent of the Debtor's nonpriority unsecured claims amounts to $11,012.64 based on the Debtor's schedules.[17] *See* U.S. Trustee Ex. 1, at 7. This amount is greater than the $7,475.00 statutory amount listed in Section 707(b)(2)(A)(i)(I). At the next step, the $11,012.64 amount is less than the $12,745.00 statutory amount listed in Section 707(b)(2)(A)(i)(II), so the $11,012.64 figure must be used in the formula rather than the statutory amount. Thus, the Court must compare this figure with the calculation in Section 707(b)(2)(A)(i)(I)—i.e., whether the $11,012.64 amount is less than the Debtor's current monthly income reduced by certain expenses listed under subsections (ii), (iii), and (iv), and multiplied by 60. *See* 11 U.S.C. § 707(b)(2)(A).

A.    Current Monthly Income

The Bankruptcy Code defines "current monthly income" as "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the [applicable] 6-month period" and "includes any amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor or the debtor's dependents . . . ." 11 U.S.C. § 101(10A). The Statement of Current Monthly Income, which must be filed by an individual in a Chapter 7 case pursuant to Rule 1007(b)(4) of the Federal Rules of Bankruptcy Procedure, requires a debtor to report all of the debtor's income as well as all of the non-filing spouse's income for the applicable period. *See* Fed. R. Bankr. P. 1007(b)(4); U.S. Trustee Ex. 1, at 41. Here, the Debtor listed $7,384.89 for the Debtor's income, $4,645.33 for Mrs. Ervin's income, and $12,030.22 for total current monthly income. *See id.* at 41-42.

---

[17] In the U.S. Trustee's closing argument brief, the U.S. Trustee calculates $10,218.89 as 25 percent of the Debtor's non-priority unsecured debt. However, this calculation appears to be based on the $40,875.54 total from Schedule F only, and does not incorporate the $3,175.00 listed on Schedule D. The Court's calculation is based on the $44,050.54 total on Line 5, "Total of non-priority unsecured debt" on the Statistical Summary of Certain Liabilities and Related Data. *See* U.S. Trustee Ex. 1, at 7.

According to the Debtor's payment advices and the Debtor's testimony at trial, he should have listed, for the average during the applicable six-month period,[18] an amount under Part 1, Line 2, Column A, i.e., "Your gross wages, salary, tips, bonuses, overtime, and commissions (before all payroll deductions)" of at least $7,491.56 because the Debtor received $44,949.33 from the Town of Rocky Mount during the applicable six-month period.  *See* U.S. Trustee Ex. 1, at 41; U.S. Trustee Ex. 3, at 1-3.  By listing $7,384.89, the Debtor understated his average monthly income in the applicable period by $106.67.  In addition, in Column B of the same category, based on Mrs. Ervin's payment advices and both the Debtor's and her testimony at trial, the Debtor should have listed, for Mrs. Ervin's income, an amount of at least $4,824.00.  *See* U.S. Trustee Ex. 1, at 41; U.S. Trustee Ex. 4, at 1-2.  By listing $4,645.33, the Debtor understated Mrs. Ervin's average monthly income in the applicable period by $178.67.  Thus, under Line 11 of the Statement of Current Monthly Income, the Debtor should have listed a total current monthly income of $12,315.56 ($7,491.56 + $4,824.00), rather than $12,030.22.

In addition, the Debtor has overstated the part of Mrs. Ervin's income not used to pay for the household expenses of the Debtor or the Debtor's dependents.  Under Part 1, Line 3c of the Means Test Form, the Debtor listed "Debts solely of wife (see attached)" in the amount of $1,994.07.  *See* U.S. Trustee Ex. 1, at 43.  On Attachment 3(C) to the form, the Debtor listed "Payment to Spectrum Engineering – wife's employer" in the amount of $615.00.  However, Mrs. Ervin testified that during the applicable six-month period, the $615.00 monthly payment was not set aside to pay Spectrum.  Given the lack of documentation to substantiate this obligation, the lack of actual payment, and the lack of evidence as to the ramifications of non-payment, the Court finds little basis to include it as a proper adjustment to her income for the purposes of calculation.  Accordingly, the current monthly income cannot be reduced by the

---

[18] The applicable six-month period is October 1, 2014 to March 31, 2015.  *See* U.S. Trustee Ex. 1, at 41.

$615.00 amount, and the $1,994.07 amount listed in Line 3c should have been listed as

$1,379.07 ($1,994.07 - $615.00) and the total listed in Line 3d should have been $2,758.87

($1,216.19 + $163.61 + $1,379.07).  Thus, the current monthly income listed in Line 4 should

have been listed as not less than $9,556.69 ($12,315.56 - $2,758.87).[19]

B.    <u>Deductions</u>

As noted above, the burden of proving an abusive filing under Chapter 7 is on the U.S.

Trustee.  However, as stated by this Court in *Meade*, this is "subject to one qualification,"

namely "that when a presumption of abuse would arise under [Section 707](b)(2) based on a

debtor's income and allowed expenses according to the prescribed [IRS] "national standards" or

"local standards" guidelines . . . but the debtor asserts that other 'necessary expenses' or

permitted deductions for debt repayment . . . negate the presumption of abuse, the burden of

proof as to those deductions ought to be placed on the debtor."  *In re Meade*, 420 B.R. 291, 303

(Bankr. W.D. Va. 2009).  The Court finds that the Debtor has not met his burden of proving all

of the deductions claimed by the Debtor on the Means Test Form.

1.    <u>Health Care Expenses</u>

First, the Debtor has failed to meet his burden of proving the health care expense

deductions on Lines 22 and 25 of the Means Test Form.  Based on the Debtor's testimony, the

$150.00 expense claimed on Line 25 is, in reality, a Flexible Spending Account, not a Health

Savings Account.  According to the statutory text and plain language of the Means Test Form,

only contributions to Health Savings Accounts are deductible on Line 25.  *See* 11 U.S.C. §

707(b)(2)(A)(ii)(I); U.S. Trustee Ex. 1, at 49.  Line 7 provides a statutory allowance of out-of-

pocket health care expenses according to the IRS National Standards, in this case $240.00 for the

---

[19] This is taking into account that Line 1 of the Means Test Form (Line 11 of the Statement of Current Monthly Income) should have been listed as $12,315.56 as noted above.

Debtor, while Line 22 provides for additional health care expenses, excluding insurance costs. Notably, the instructions to Line 7 state, "If your actual expenses are higher than this IRS amount, you may deduct the additional amount on line 22," and the instructions to Line 22 state, "Include only the amount that is more than the total entered in line 7." *See* U.S. Trustee Ex. 1, at 45, 48. Thus, the $150.00 deduction on Line 25 for "Health savings account" should not have been claimed. In addition, the $120.00 payment to LewisGale for a "medical bill" is already accounted for on Line 3. Thus, the Debtor failed to prove that an amount greater than $371.38 per month was spent on health care expenses. *See* U.S. Trustee Ex. 11. Accordingly, the Debtor should have listed $131.38[20] on Line 22, not $235.00. *Compare In re Maura*, 491 B.R. 493, 509 (Bankr. E.D. Mich. 2013) (Determining that the expense claimed by the debtors for the out-of-pocket health care allowance set by the IRS National Standards "impermissibly duplicates" the amount claimed by the debtors for their health savings accounts that was later reimbursed to them).

2. <u>Vehicle Expenses</u>

However, the Debtor's vehicle operation expense listed in Line 12 under the "Local Standards" section of the Means Test Form is permitted based on the Court's findings. Instead of listing $244.00, which is the IRS Local Standard for the operating costs of one vehicle, the Debtor listed $488.00, i.e., the operating cost for two vehicles.[21] At the trial, the Debtor testified that he owns a Nissan (Altima) and a Chevy Silverado. He further testified that that his daughter "drives the [Chevy] to and from work" and "will hopefully be taking it to and from school shortly," and that the Chevy is the "only vehicle that will make it up our driveway." He also

---

[20] This amount is equal to the average medical expenses (not including the $120.00 payment to LewisGale) of $371.38 less the $240.00 allowance provided for in Line 7.

[21] *See* IRS Local Transportation Expense Standards - South Census Region (Cases Filed Between April 1, 2015 and May 14, 2015, Inclusive), http://www.justice.gov/ust/eo/bapcpa/20150401/bci_data/IRS_Trans_Exp_Stds_SO.htm.

stated that Mrs. Ervin drives and maintains a separate vehicle.  The Bankruptcy Code states:

"The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts

specified under the National Standards and Local Standards, and the debtor's actual monthly

expenses for the categories specified as Other Necessary Expenses issued by the [IRS] for the

area in which the debtor resides."  11 U.S.C § 707(b)(2)(A)(ii)(I).   In *Ransom*, the U.S. Supreme

Court determined the following:

> The key word in this provision is "applicable.": A debtor may claim not all, but
> only "applicable" expense amounts listed in the Standards . . . .
>
> Because the Code does not define "applicable," we look to the ordinary
> meaning of the term. *See, e.g., Hamilton v. Lanning*, 560 U.S. 505, 513–, 130
> S.Ct. 2464, 2471, 177 L.Ed.2d 23 (2010). "Applicable" means "capable of being
> applied: having relevance" or "fit, suitable, or right to be applied: appropriate."
> Webster's Third New International Dictionary 105 (2002). See also New Oxford
> American Dictionary 74 (2d ed. 2005) ("relevant or appropriate"); 1 Oxford
> English Dictionary 575 (2d ed. 1989) ("[c]apable of being applied" or "[f]it or
> suitable for its purpose, appropriate"). So an expense amount is "applicable"
> within the plain meaning of the statute when it is appropriate, relevant, suitable, or
> fit.
>
> What makes an expense amount "applicable" in this sense (appropriate,
> relevant, suitable, or fit) is most naturally understood to be its correspondence to
> an individual debtor's financial circumstances. Rather than authorizing all debtors
> to take deductions in all listed categories, Congress established a filter: A debtor
> may claim a deduction from a National or Local Standard table (like "[Car]
> Ownership Costs") *if, but only if, that deduction is appropriate for him*. And a
> deduction is so appropriate only if the debtor has costs corresponding to the
> category covered by the table—that is, *only if the debtor will incur that kind of
> expense during the life of the plan*. The statute underscores the necessity of
> making such an individualized determination by referring to "*the debtor's*
> applicable monthly expense amounts," § 707(b)(2)(A)(ii)(I) (emphasis added)—in
> other words, the expense amounts applicable (appropriate, etc.) to each particular
> debtor. Identifying these amounts requires looking at the financial situation of the
> debtor and asking whether a National or Local Standard table is relevant to him.

*Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69-70 (2011) (emphasis added).

Under the circumstances of this case, a vehicle operation expense deduction for the

Chevy is "appropriate" for the Debtor and is an expense the Debtor "will incur . . . during the life

of the plan." *Id.* at 70.  Thus, the Debtor correctly listed the applicable vehicle operation expense

for two vehicles, i.e., $488.00.[22]  Allowing the Debtor to claim the deduction for two vehicles

does not contravene Congress's purpose in designing the means test in BAPCPA, i.e., "to ensure

that [debtors] repay creditors the maximum they can afford."  *Id.* at 71 (quoting H.R. Rep. No.

109–31, pt. 1, at 2 (2005)).  Moreover, because the IRS guidelines provide flexibility for such an

expense, and because the Court finds that the vehicle operation expense for both the Nissan and

the Chevy are reasonably necessary for the care and support of the Debtor and his daughter, the

Court will allow the deduction.  *See In re Johnson*, 454 B.R. 882, 892-94 (Bankr. M.D. Fla.

2011) (providing the debtor, who claimed an expense for a car driven by his minor daughter,

with an opportunity to present evidence at a hearing regarding whether expenses for the car were

reasonably necessary for the care and support of the debtor and the debtor's dependents).

    C.    <u>Determining Whether There Is a Presumption of Abuse</u>

Adjusting the deductions as provided above, the Debtor should have listed, for "Total

deductions" in both Line 38 and Line 39b, a total of $8,424.17.[23]  Calculating Line 39c results in

a monthly disposable income of $1,132.52 ($9,556.69 - $8,424.17), and when multiplied by 60,

results in a total of $67,951.20 for Line 39d.  Thus, per the Instructions to Line 40, Line 39d is

more than $12,475.00[24] and a presumption of abuse arises.  Accordingly, the U.S. Trustee has

satisfied her burden of proving that the presumption of abuse arises in this case.

---

[22] *See* IRS Local Transportation Expense Standards, *supra*, note 21.
[23] This calculation results from adjusting the IRS expense allowances in Line 24 to $6,322.50, the additional expense deductions in Line 32 to $450.00, and deductions for debt payment in Line 37 of $1,651.67.  *See* Means Test Form, Line 38 Instructions.
[24] This figure is the statutorily prescribed amount set by the Judicial Conference of the United States and is adjusted at three-year intervals.  *See* 11 U.S.C. §§ 104(a), 707(b)(2)(A)(i)(II).

**IV.**     **Rebutting the Presumption of Abuse By Showing Special Circumstances**

Case law provides that "once a presumption of abuse [under Section 707(b)(2)] has

arisen, the 'burden of proof to rebut the presumption of abuse is on the debtor.'"  *Meade*, 420

B.R. at 303 (quoting *In re Witek*, 383 B.R. 323, 330 (Bankr. N.D. Ohio 2007)).  As stated above,

"the presumption of abuse may only be rebutted by demonstrating special circumstances."  11

U.S.C. § 707(b)(2)(B)(i).  In this case, the Debtor has failed to show that special circumstances

sufficient to rebut the presumption of abuse exist.

Part 4 of the Means Test Form states "Give Details About Special Circumstances."  Line

43 thereunder states "Do you have any special circumstances that justify additional expenses or

adjustments of current monthly income for which there is no reasonable alternative?"  The

Debtor marked "No" and left this part of the form blank.  *See* U.S. Trustee Ex. 1, at 52.  "In

order to establish special circumstances, the debtor shall be required to itemize each additional

expense or adjustment of income and to provide—(I) documentation for such expense or

adjustment to income; and (II) a detailed explanation of the special circumstances that make such

expenses or adjustment to income necessary and reasonable."  11 U.S.C. § 707(b)(2)(B)(ii).  The

Debtor in this case failed to provide such a "detailed explanation of special circumstances" on

his Means Test Form.

Moreover, at the trial, the Debtor did not provide sufficient evidence to demonstrate that

special circumstances exist.  Congress provided two examples of special circumstances in

Section 707(b)(2)(B)(i): "the presumption of abuse may only be rebutted by demonstrating

special circumstances, such as a *serious medical condition* or a *call or order to active duty in the*

*Armed Forces*, to the extent such special circumstances that justify additional expenses or

adjustments of current monthly income for which there is no reasonable alternative."  11 U.S.C.

§ 707(b)(2)(B)(i).  The Court recognizes that a split of authority exists regarding whether the two

examples provided by Congress in Section 707(b)(2)(B)(i) should be interpreted narrowly or

broadly.  Judge Kenney of the Eastern District of Virginia concisely summarized the divergent

views on establishing special circumstances in *In re Burdett*, No. 12-12066-BFK, 2013 WL

865575, 2013 Bankr. LEXIS 845 (Bankr. E.D.Va. March 7, 2013).  *Burdett* stated as follows:

> The courts have diverged on whether to apply a narrow view, under which the
> circumstances must be truly extraordinary, or a more broad view, under which the
> standard is more lenient and may include more ordinary circumstances. *See In re
> Davis,* 2011 WL 5884015, at *4 (Bankr.N.D.Tex.2011) (contrasting the narrow
> view, where the debtor has "a significant burden to overcome," with the broad
> view, where "circumstances need not be extraordinary, unanticipated or outside
> the control of the debtor"); *In re Siler,* 426 B.R. 167, 172 (W.D.N.C.2010)
> (collecting cases representing the broad view and the narrow view). Certainly, the
> courts agree that the issue of special circumstances is to be determined on a case-
> by-case basis. *In re Davis,* 2011 WL 5884015, at *4 (Bankr.N.D.Tex.2011).
>
> The Court views the language of the statute as the starting point for its
> interpretation.  In using the term "such as," followed by two potentially life-
> altering events (serious illness or a call to active duty in the military), Congress
> requires a seriousness with respect to the term "special circumstances."  Congress
> did not mean to make it impossible for debtors to meet this standard; had that
> been Congress's intent, it could have deleted the special circumstances exception
> altogether.  Including the two special circumstances examples, however, signals
> an intent that the circumstances be of a more severe nature than ordinary job
> changes or income fluctuations. *Lanning,* 130 S. Ct. at 2477 ("Section 707
> identifies as examples of 'special circumstances' a 'serious medical condition or a
> call or order to active duty in the Armed Forces,' [§ 707(b)(2)(B)(i) ], and
> petitioner directs us to no authority for the proposition that a prepetition decline in
> income would qualify as a 'special circumstance.'"); *In re Meade,* 420 B.R. at
> 305 ("the particular facts relied upon by a debtor to establish 'special
> circumstances' ought to be of the same nature as the type of events cited by
> Congress to illustrate what it had in mind for such term, to-wit: 'a serious medical
> condition or a call or order to active duty in the Armed Forces' "); *In re DeJoy,*
> 2011 WL 5827319, at *4 (Bankr.N.D.N.Y.2011) ("in order for the court to find
> special circumstances, a debtor must show that his or her situation rises to the
> same level of extremity as a serious medical condition or active duty in the armed
> forces").

*Burdett*, 2013 WL 865575, at *3-4, 2013 Bankr. LEXIS 845, at *10-12.  The Court adopts

neither the broad nor the narrow view.  Instead, it takes a middle road and agrees with Judge

Kenney that special circumstances should be addressed on a case-by-case basis, with the Court

being mindful that Congress signaled "an intent that the circumstances be of a more severe

nature than ordinary job changes or income fluctuations." *Id*. at *4, 2013 Bankr. LEXIS 845, at

*11. This approach is not inconsistent with that taken in *Alther*, a case decided by the Chief

Judge of this district. *See Alther*, 537 B.R. at 267 ("This Court concludes that to rebut the

presumption of abuse under section 707(b)(2), a debtor must demonstrate 'special circumstances'

which, as the name implies, are 'special.' The circumstances must be unusual, yet necessary.")

A.      <u>Maintaining Two Residences</u>

In support of his position that special circumstances exist, the Debtor argues that, due to

his job as Town Manager of Rocky Mount, Virginia, he must have a physical address in Rocky

Mount. He also testified that he has applied for positions with a more desirable commute with

no success. The Debtor maintains that, because his 17-year-old daughter now lives with him,

instead of with the Debtor's ex-wife, the Debtor must commute more frequently between his

residence in Blacksburg and his apartment in Rocky Mount. Moreover, the Debtor argues the

fact that his ex-wife does not pay child support for the daughter also supports a determination

that special circumstances exist.

These are difficult circumstances no doubt, and the Court sympathizes with the Debtor

and his wife. The Court found both the Debtor and Mrs. Ervin to be believable witnesses,

despite the deficiencies in their various filings in this case. The Court is well familiar with each

of their commutes, and they are not easy ones. Moreover, trying to divide time between two

residences and meet the requirements of employment and parenthood are unquestionably

challenging and stressful. However, there is simply little evidence before the Court as to the

itemized expenses and adjustments to income that the Court can hone in upon to deviate from the

calculations that weigh against the Debtor.  Despite the U.S. Trustee's urging, the Court declines

the invitation to penalize the Debtor for failing to seek support from his ex-wife or to more

aggressively find a new job closer to home.

Even if the Debtor had satisfied the statutory predicate requirements of an itemization

and documentation, the Debtor has not met his substantive burden of proving that these expenses

constitute special circumstances as required by Section 707(b)(2).  *See, e.g.*, *In re Parulan*, 387

B.R. at 172-73 ("It is true that [the debtor] did provide testimony under oath attesting to the

[alleged special circumstances] . . . but merely offering testimony without satisfying the

predicate requirements of an itemization and documentation in § 707(b)(2)(B)(ii) does not

comport with the statute. . . . Even putting aside the procedural problems already noted, the

limited evidence before the court fails to establish that the [alleged special circumstances are] . . .

'uncommon,' 'unusual,' or 'exceptional.'")

B.      Mrs. Ervin's Employment with Spectrum

The Debtor also argues that a variety of matters pertaining to Mrs. Ervin's employment

constitute special circumstances within the scope of Section 707(b)(2)(B).  These include her

daily 97-mile round trip commute to Roanoke to her job at Spectrum, where Spectrum's only

office is located.  The Debtor further asserts that, because Mrs. Ervin's present car loan will be

paid in full in June 2016, the car will have 200,000 miles on it by that time, and because Mrs.

Ervin did not anticipate having to travel to work in Roanoke more than two days per week when

she became partner, the Debtor is entitled to special circumstances.  The Debtor further argues

that the "buy-in" debt for a 7.269 percent partnership interest, and the necessity of transportation

expenses to and from work, justify a special circumstances finding.

Similar to most retirement loans and student loans, there is usually nothing rare or unusual about a voluntary debt obligation to acquire a partnership interest. *See, e.g.*, *Alther,* 537 B.R. at 269 ("Voluntary 401(k) contributions are not special circumstances for the purpose of section 707(b)(2), because they are not unusual and there is a reasonable alternative of not making the voluntary contributions."); *cf. In re Siler*, 426 B.R. 167, 174 (Bankr. W.D.N.C. 2010) ("[I]n most situations these student loans were incurred in the ordinary pursuit of a career. They are not unique and they do not enjoy statutory priority over other creditor claims."). Moreover, the Debtor did not establish that Mrs. Ervin would not likely be able to obtain a similar vehicle requiring approximately the same monthly payments as the current payments of $291.00 per month listed on Attachment 3(C) to the Means Test Form. In addition, the Debtor provided no support for a finding that commuting expenses to and from work should qualify as a special circumstance. *But see, e.g.*, *In re Turner,* 376 B.R. 370, 380 (Bankr. D.N.H. 2007) (finding a debtor's business mileage qualified as a special circumstance only after determining that the debtor's "required business travel greatly exceed[ed] that of the ordinary debtor", and that the debtor "meticulously log[ged] his miles, being careful to keep commuting miles out of his business mileage.").

B.     Imputed Tax Liability As a Result of Mrs. Ervin's Ownership Interest in Spectrum and TECA

The Debtor argues that special circumstances exist due to the fact that Mrs. Ervin will be subject to tax on imputed income as a result of her 7.269 percent partnership stake in Spectrum and her 11 percent partnership stake in TECA. In addition, the Debtor argued that, although the controlling ownership interests of TECA decided not to grant a distribution of profits in 2014, and because Spectrum had a net loss for 2014, the Debtor anticipates that 2015 will be quite different. Moreover, the Debtor projects Mrs. Ervin's cumulative tax liability between TECA

and Spectrum for 2015 to be between $3,600 and $4,200.  However, Mrs. Ervin testified that

Spectrum suffered a net loss for 2014 and thus, she was able to offset the TECA gains.  As the

burden is on the Debtor to prove special circumstances, the Court finds that the Debtor has not

satisfied this burden with respect to a greater tax liability in 2015.  Similar to fluctuations in

income, the fluctuation of potential tax liability is not a special circumstance.  *See Burdett*, 2013

WL 865575, at *4, 2013 Bankr. LEXIS 845, at *11 (citing *Hamilton v. Lanning*, 550 U.S. 505,

524 (U.S. 2010)) ("Including the two special circumstances examples . . . signals an intent that

the circumstances be of a more severe nature than ordinary job changes or income

fluctuations.").  Moreover, Mrs. Ervin testified that, in lieu of having Spectrum issue a

distribution to the partners, Spectrum may decide to pay down the open line of credit.  The Court

will not speculate on what Spectrum may or may not do in the future.  In addition, the Debtor has

received substantial tax refunds in the past, ranging from $1,672.00 to $7,304.00, and thus, these

returns could fluctuate with the amount of tax liability assessed.

C.    <u>Health Problems of Mrs. Ervin and Her Son</u>

Finally, the Debtor argues that both Mrs. Ervin and her son have medical issues which

are not being adequately addressed due to financial constraints.  Mrs. Ervin testified that she

suffered serious injuries after she fell in 2011, including a ruptured spleen which had to be

removed, resulting in a weakened immune system, and a torn Achilles tendon, resulting in a

noticeable limp.  Mrs. Ervin also testified that she suffers from hypersomnia,[25] which required

medication prescribed postpetition.  In addition, Mrs. Ervin testified that her son has not been

receiving the requisite number of counseling sessions that have been recommended.  No

---

[25] Mrs. Ervin testified that her hypersomnia makes her excessively sleepy, but is not as severe as narcolepsy for which prescription medicine is more readily available under her health plan.  Mrs. Ervin testified that during her commutes she would often have to pull off the road up to three times in the evenings to deal with her sleep disorder. The prescription medicine she now takes makes that disorder less disruptive and enables to her work and commute more effectively and safely.

evidence was submitted by the Debtor to substantiate the cost of additional counseling for Mrs.

Ervin's son, so no deduction from her income is appropriate in that regard.

Mrs. Ervin testified that she has only been able to purchase one-half of her prescription

medication at $290.00, which is not covered by insurance.  Although the Debtor failed to

substantiate the necessity of the NuVigil prescription with any sort of documentation, other than

Mrs. Ervin's statement on the record that she was taking a half-pill dose as recommended by her

doctor, the plain language of Section 707(b)(2)(B)(i) is clear—a "serious medical condition"

justifies additional expenses where no reasonable alternative exists.

The U.S. Trustee asserts that the Court should probe why other alternative treatments

were not pursued, and the Court declines that invitation as well.  The Court is not going to

second guess Mrs. Ervin or her doctor's recommendation on this matter.  The Court finds Mrs.

Ervin to be a credible witness and finds no basis to believe her testimony to be untruthful or

exaggerated.  The medicine enables her to safely complete her extensive daily commute, and the

Court finds the $290.00 deduction for her medication to be appropriate as an unusual

circumstance.  However, even with this deduction being allowed, the Debtor still fails the means

test.[26]

## **CONCLUSION**

In summary, the Debtor understated his monthly income by $106.67 and Mrs. Ervin's

monthly income by $178.67 on Line 2 of Form 22A-1, Chapter 7 Statement of Your Current

Monthly Income.   The Debtor then overstated the deduction for income not used to pay

household expenses by $615.00 on Form 22A-2, Chapter 7 Means Test Calculation.  For these

---

[26] Adding an additional $290.00 monthly expense for this medication would result in total deductions in Line 39b of
$8,714.17.  Subtracting this new deduction amount ($8,714.17) from the adjusted current monthly income
($9,556.69) would result in a monthly disposable income of $842.52 in Line 39c.  Accordingly, when multiplied by
60, the amount would be $50,551.20 for Line 39d, and a presumption of abuse still arises per Line 40.

reasons, Line 3c of the Means Test (debts solely of wife) should have been $1,379.07 (instead of

$1,994.07); Line 3d (total adjustment to income) should have been $2,758.87 (not $3,373.87);

and the total on Line 4 (current monthly income) should have been $9,556.69 (and not

$8,656.35).

The Court disagrees with the U.S. Trustee and allows the vehicle operation expense of

$488.00 as claimed by the Debtor on Line 12, but agrees with the U.S. Trustee that the Debtor

should have only claimed $131.38 in additional health care expenses (and not $235.00) on Line

22.  This changes the total expenses allowed under the IRS expense allowances to $6,322.50 on

Line 24.  As far as the additional expense deductions, the Court agrees with the United States

Trustee that the $150.00 deduction claimed on Line 25 for a health savings account should not

have been claimed.  Therefore, the total additional expense deductions claimed on Line 32

should have been $450.00 (and not $600.00).   Making these corrections to the Debtor's Means

Test calculations, subtracting the allowed deductions of $8,424.17 from adjusted current monthly

income of $9,556.69, leaves the Debtor with $1,132.52 in monthly disposable income.

Multiplying that figure by 60 as required by Line 39d results in a figure of $67,951.20 which is

more than $12,475 and the presumption of abuse arises.  Even allowing the $290.00 deduction

claimed by the Debtor for medication as a special or unusual circumstance, the presumption of

abuse still arises.

For the above stated reasons, a presumption of abuse under Section 707(b)(2) arises in

this case, and the Debtor has not sufficiently rebutted the presumption by proving special

circumstances exist.  Consequently, the Court grants the U.S. Trustee's Motion to Dismiss Case

for Abuse, and will dismiss the Debtor's case unless the Debtor moves to convert this case to a

case under Chapter 13 of the Bankruptcy Code within twenty-one (21) days of entry of the order

entered contemporaneously herewith.  Because the Court concludes that the U.S. Trustee's

Motion is granted under section 707(b)(2), the Court need not address the U.S. Trustee's

alternate request to dismiss under the Section 707(b)(3)(B) totality of the circumstances test.  *See*

*Alther*, 537 B.R. at 263.

A separate Order will be entered contemporaneously herewith.

Decided this 23rd day of February, 2016.

_____

UNITED STATES BANKRUPTCY JUDGE